MECCANO, Limited, v. WAGNER et al.

(District Court, S. D. Ohio, W. D.   June 12, 1916.)

No. 23.

1. TRADE-MARKS AND TRADE-NAMES ⚖75—UNFAIR COMPETITION—DECEPTION —NECESSITY.

Where defendant dressed his goods to resemble those of complainant, and in every way attempted to palm them off as complainant's, evidence that customers were deceived and purchased defendant's goods as those of complainant is unnecessary to establish unfair competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 86; Dec. Dig. ⚖75.]

2. TRADE-MARKS AND TRADE-NAMES ⚖70(1)—UNFAIR COMPETITION—WHAT CONSTITUTES.

Complainant and its predecessor originated a mechanical building toy for children. The toy was extensively advertised and sold in distinctive boxes, which were accompanied by manuals showing how the various parts could be combined to form many interesting and instructive appliances, such as bridges, and the like. The outfits were interchangeable, and consisted of various numbers of parts to which additions might be made. Defendant prepared a mechanical toy along exactly the same lines, selling it under a different name, but under the same dress as that of complainant's and copying its manual. Held, that in view of the fact that defendant sold its toy for a less price and attempted to palm off its goods for those of complainant, it was guilty of unfair competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. ⚖70(1).]

3. TRADE-MARKS AND TRADE-NAMES ⚖68—UNFAIR COMPETITION—WHAT CONSTITUTES.

Where complainant established a business system peculiarly its own, defendant is guilty of unfair competition in attempting to appropriate such business system and substitute its goods for those of complainant.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 79; Dec. Dig. ⚖68.]

4. COPYRIGHTS ⚖5—MATTER WHICH MAY BE COPYRIGHTED.

While only those writings and discoveries which are the result of intellectual labor may be copyrighted, a manual, instructing how to use a mechanical toy prepared for children, which was more than a mere advertisement, being a guide to the combinations which children might form with the toy, and explaining many principles of mechanics, may be copyrighted.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 3, 13; Dec. Dig. ⚖5.]

5. COPYRIGHTS ⚖83—INFRINGEMENT—INTENTION.

While intention to infringe is immaterial, if infringement of the copyright otherwise appears, yet an intention to infringe may be considered in determining whether there was an actual infringement.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 74-76; Dec. Dig. ⚖83.]

⚖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. COPYRIGHTS ⊜➠56—INFRINGEMENT—PARAPHRASING.
   The mere paraphrasing of a copyrighted work constitutes an infringement.
   [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 52; Dec. Dig. ⊜➠56.]

7. COPYRIGHTS ⊜➠57—INFRINGEMENT—WHAT CONSTITUTES.
   To appropriate a substantial portion of a copyrighted work which diminishes the value thereof constitutes an infringement.
   [Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 53, 60; Dec. Dig. ⊜➠57.]

8. COPYRIGHTS ⊜➠26—APPLICATION—BLANKS.
   Where the duly authorized agent of the owner who made an affidavit for a copyright failed to strike from the printed form alternative statements of fact applicable to the particular capacity of the affiant, but it appeared that no fraud or injury was intended to the government, an infringement of the copyright granted cannot be defended on such ground.
   [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 24; Dec. Dig. ⊜➠26.]

9. COPYRIGHTS ⊜➠26—VALIDITY—AFFIDAVIT.
   That the agent of the foreign owner who filed an affidavit for a copyright did not actually see the printing of the copyrighted work in the United States will not invalidate the copyright, where he engaged a printer to do the work.
   [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 24; Dec. Dig. ⊜➠26.]

10. COPYRIGHTS ⊜➠40—VALIDITY—ABANDONMENT.
    Where complainant copyrighted a manual for use in connection with the sale of its mechanical toys, the fact that it copyrighted a manual issued in 1912 was not an abandonment of the 1911 manual; the latter one being a new work.
    [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 35; Dec. Dig. ⊜➠40.]

11. COPYRIGHTS ⊜➠18—VALIDITY—DISPOSAL OF BOOKS PUBLISHED IN FOREIGN COUNTRY.
    Complainant, an English company, sold mechanical toys, and editions of a manual, copyrighted in the United States, were printed in England and accompanied the outfits sold in the United States. Copyright Act March 4, 1909, c. 320, §§ 15, 31, 32, 35 Stat. 1078, 1082, 1083 (Comp. St. 1913, §§ 9536, 9552, 9553), respectively, provide that works not produced for sale may be copyrighted; that any book published abroad with authorization of the author or copyright proprietor may be imported, but that works imported in violation of the act shall be destroyed. *Held*, that such importation and disposal of the English editions did not invalidate the copyright.
    [Ed. Note.—For other cases, see Copyrights, Dec. Dig. ⊜➠18.]

12. COPYRIGHTS ⊜➠32—ANTICIPATION—WHAT CONSTITUTES.
    Complainant's copyrighted manual for use in connection with a mechanical toy is not invalid because of a previous uncopyrighted work for use in connection with such toys, where the uncopyrighted work did not contain all of the matter in the copyrighted book.
    [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 34; Dec. Dig. ⊜➠32.]

13. PATENTS ⊜➠112(1)—VALIDITY—PRESUMPTIONS.
    A patent is prima facie valid.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 162; Dec. Dig. ⊜➠112(1).]

**14. PATENTS ☞26(2)—PATENTABILITY—SUBJECT-MATTER OF PATENT.**

A rectangular plate and a so-called sector for use in connection with a mechanical building toy, consisting of many strips with slotted holes, which could be used to form many ingenious devices, and thus educate the young in principles of mechanics, are, where not anticipated, the subject of a patent showing invention; the sector and plate being different from the mere strips and allowing different combinations.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 29; Dec. Dig. ☞ 26(2).]

**15. PATENTS ☞35—INVENTION—EVIDENCE.**

In determining whether a device is patentable or not, the fact that it has gone into general use may be considered.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 39; Dec. Dig. ☞ 35.]

**16. PATENTS ☞72—ANTICIPATION—ABANDONMENT.**

Where before it was attempted to be patented, a rectangular plate had formed part of a mechanical toy building outfit, the fact that the plate was thereafter flanged will not warrant the issuance of a patent; the device having been abandoned to the public.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 86–91; Dec. Dig. ☞72.]

**17. PATENTS ☞20—PATENTABILITY—IMPROVEMENT.**

A sector or plate, intended for use in connection with a mechanical building toy, shows invention, and may be patented where it permits the formation of many new and interesting combinations which could not be formed out of simple strips and rectangular plates.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 20–22; Dec. Dig. ☞20.]

**18. PATENTS ☞182—INVENTION—RIGHT TO.**

Where defendant did not, with reasonable diligence, attempt to reduce his conception of an invention to practice, and failed to patent it, he cannot assert any rights thereafter.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 258; Dec. Dig. ☞182.]

**19. PATENTS ☞222—INFRINGEMENT—DEFENSES.**

Where complainant, as soon as advised that a patent probably did not cover a building toy outfit, directed that the marking of the outfit patented should be discontinued, defendant cannot defeat a suit for infringement of other patents on the ground that complainant was guilty of bad faith, for that is an essential element.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 352; Dec. Dig. ☞222.]

**20. PATENTS ☞222—INFRINGEMENT—DEFENSES.**

That complainant, knowing the patent to be invalid, marked the devices "patented" is no defense to a suit against defendant for infringement of a subsequent patent on additions to the device.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 352; Dec. Dig. ☞222.]

In Equity. Suit by the Meccano, Limited, against Francis A. Wagner, trading as the American Mechanical Toy Company, and the Strobel & Wilken Company, who counterclaimed. Decree for complainant.

Reeve Lewis and Ralph L. Scott, both of New York City, and Healy, Ferris & McAvoy, of Cincinnati, Ohio, for complainant.

H. A. Toulmin, of Dayton, Ohio, for defendants.

HOLLISTER, District Judge. Action for unfair competition; infringement of copyright, and infringement of patent. Counterclaim for unfair competition.

In 1899 Frank Hornby, of Liverpool, England, conceived the idea of a mechanical toy composed of thin narrow strips of metal of different lengths perforated with holes equidistant from each other, angle bars, wheels, nuts, and bolts, so designed and constructed that by their use toy models can be built, in appearance resembling mechanical structures, and, in some instances, actually illustrating principles in mechanics applied and embodied in actual mechanical structures in common use in many arts in which the principles of mechanics are applied. Hornby had a mechanical turn of mind, and, as a boy and young man, was accustomed to the use of the simpler tools used by mechanics. He was managing clerk in the office of one Elliott, an importer of American meat and live stock. He had no means, except a small salary, and his family included two boys, for whom he constructed the metal strips and other appurtenances hereinbefore described. Various mechanical structures were built up of these, and Hornby, believing he had found a toy for which there would be a market, obtained a British patent in January, 1901. His want of means and the disinclination of the trade to further his efforts to put the device on the market did not discourage him; but, having interested his employer, he found sufficient means to further develop the toy and to bring it to the attention of the public.

The first constructions were crude and composed of comparatively few parts, but the idea was there, and by the addition from time to time of further parts, it became possible for a bright boy to build up, either on his own initiative or from illustrations in the Manual which accompanied each outfit of parts, an extraordinary number of devices resembling in form and appearance many structural devices known and used in the mechanical arts. There was nothing like it or resembling it on the market, and, after a number of years of effort to create a market by advertising and public demonstrations, a large business has been built up in the United States and elsewhere.

The toy is of great utility, of educational value, is stimulating to the imagination, appeals to a boy's creative faculties, and not only gives entertainment, but is highly instructive.

Prior to 1908, about $40,000 had been expended in the enterprise, including advertising. The toy was first called: "Mechanics Made Easy," and "Adaptable Mechanical Toy." It was in 1907 called "Meccano," by which it is known in the trade. The name was chosen after much consideration, and is a happy choice for a toy in the use of which models of mechanical devices may be built up. In 1908, the business was incorporated under the laws of Great Britain, under the name, "Meccano, Limited." It was first attempted in 1908 to interest American dealers, and in 1909 the Embossing Company of Albany, N. Y., became the exclusive agency for the United States and Canada, although prior to that time some English exporting houses had sent some of the outfits to the American market. Sales of Meccano in the

United States developed rapidly—1909, $7,000; 1910, $24,000; 1911, $49,000; 1912, $114,000—and up to the last date, approximately $100,-000 had been spent in advertising, demonstrating in department stores, and divers other ways.

Each "outfit" of Meccano contains certain units, consisting of flat strips of metal, angular strips and plates of design and dimension of previous conception, so as to be adapted to the various kinds of models to be constructed. In these strips, etc., the place and dimension of the holes are also the result of thought, especially so in the early conception and development of the toy. This is also true of the ample fastenings by which units may be held together as well as appropriate wheels and other devices used in building up the models, and all of these were made according to a standard, and are, through the various kinds of outfits complainant sells, interchangeable, so that the parts of one outfit may, when appropriate, be interchanged with other parts; and in all the outfits, parts are interchangeable. The Meccano outfits are numbered from "0" to "6," inclusive, and the company sells accessories and supplemental outfits numbered "0A" to "5A," inclusive. In "0," there are different parts making up that outfit. From these parts a number of models can be made. This outfit has a certain price. In "0A," there are additional parts, which together are sold at a certain price. When "0A" is added to "0," they together make outfit "No. 1," And so on the system goes, the outfits expanding in parts and units until outfit "6," together with supplemental parts "5A," make up and comprise all of the preceding outfits and the additional parts to each outfit, the price becoming greater as the outfits contain more parts, units, etc. The plan upon which these commodities are sold was preconceived and has a definite object. If a boy starts with outfit "0," and wishes to increase, by additional parts and units, the opportunity for constructing models beyond the capacity of the units and parts in "0," he purchases the additional units and parts "0A." He then has an outfit which corresponds to outfit "1." And so if he first has, say, outfit "3," it would contain all the parts of "0," "1," and "2," which, of course, would include additional parts "0A," "1A," and "2A." The units in these additional parts and the additional parts themselves may be purchased separately. If a unit has been lost or injured, it may be obtained from dealers who carry Meccano. Such a unit can be used in its appropriate connection and relation in any Meccano outfit. The valuable quality of interchangeability attaches to the various parts. Each set is accompanied by a Manual, in which is depicted models, which may be constructed by the units contained in the outfit which it accompanies, though not intended to limit the possibilities of the units, as the thought and ingenuity of the boy owner may suggest constructions not found in the Manual.

There is no doubt, and experience shows, that the use of an outfit, with its Manual, tends to develop a desire for a more extended opportunity the possession of further units would afford. Hornby created something. What he created has been developed since by him and his associates and by the complainant, which succeeded to their rights. That which was created was the result of study, of experiment, of

expense; and, when the result of these were brought to the market and to the attention of consumers, it became a creation of very great value.

It was known by a distinctive trade-name, and gave to the consuming public a toy of a new character which was in its essence a "model builder" and might well have received that name. Each of the outfits has printed on its cover or casing, "Manufactured by Meccano, Ltd., Liverpool, Eng." The box covers of Meccano outfits are black, the label—the color red predominating, the word "Meccano" in large letters being in red, and the legend, "The World's Mechanical Wonders in Every Home," being in red—when pasted on leaves a margin of black.

In each outfit, the parts or units making it up are neatly arranged in the containing box. The label also on the box represents a boy building a model of one kind or another.

[1, 2] There is no doubt that when the defendant Francis A. Wagner, trading as the American Mechanical Toy Company, introduced into the market the commodities of which Meccano, Limited, complain, the trade and a large part of the consuming public were acquainted with complainant's model builder, and the trade and those of the consuming public who had seen Meccano outfits knew it as of British make. The name "Meccano" itself attracts attention, and particularly when seen in connection with printed representations of models of well-known mechanical constructions; and the name had become identified with a toy model builder, the only one of its kind.

Prior to the date this suit was brought, Wagner and the defendant the Strobel & Wilken Company, of New York and Dayton (Wagner's selling agents), had introduced into the market a model builder, which, except for great care in examination, cannot be distinguished from the complainant's Meccano; and, in connection with the model builder so introduced by defendants, a Manual which could not in my judgment, have been made in the way they are made, in the language and figures chosen, and in the models displayed, unless the constructor had before him a Manual or Manuals issued by complainant.

The covers of defendants' outfits are black. The predominating color of the label is red, a boy engaged in the construction of a mechanical model is displayed; and on the label is inscribed "The World's Greatest Mechanical Wonder." The choice of the name, "The American Model Builder," is significant, giving the impression that it is different from the British model builder (the prior and well-known Meccano), when, in fact, it is the same. The idea conveyed by defendants' label is just the same as the idea conveyed by complainant's label. If one had seen an advertisement of a Meccano model builder, or had seen a neighbor's boy building models with Meccano mechanical units, and had gone to a toy store for the purpose of buying such an outfit and had seen there defendants' outfits and had purchased one, there is no doubt he would think he had bought what he had gone after. There is testimony showing results of similar character. Testimony, however, is not needed, for the outfits themselves, in numbers and parts corresponding with the complainant's and the

arrangement of the parts in the boxes and the appearance of the boxes, are enough in themselves, without any testimony to warrant the court in concluding, as is now concluded, that the defendants' outfits, parts, boxes, and labels would deceive the purchasing public, and were so intended. A mere glance at Plaintiff's Exhibits 8, 15, and 17, of defendants' outfits of 1912, and a comparison of these with Plaintiff's Exhibits 24 to 26, inclusive, show that the one is copied from the other in all substantial details. The intention to deceive may be inferred "from the inevitable consequences of the act complained of." Elgin Watch Co. v. Illinois Watch Co., 179 U. S. 665, 674, 21 Sup. Ct. 270, 45 L. Ed. 365; Samson Cordage Works v. Puritan Cordage Works, (C. C. A. 6) 211 Fed. 603, 608, 128 C. C. A. 203, L. R. A. 1915E, 1107.

Defendants' outfits are also seven in number, numbered 1 to 7, inclusive, so that "No. 1" corresponds to Meccano "0," and so on. Hence, for instance, "No. 3" American Model Builder is the same as Meccano "2," and additional parts "0A" Meccano are additional parts "No. 1½" American Model Builder. As an illustration, the Meccano, 1911, lists of separate parts—some of peculiar construction—have been duplicated in all respects in the defendants' corresponding lists. The defendants have added two parts, a rack and eccentric wheel. Meccano had not, prior to that time, listed or made these—at least, had not put them upon the market. These and a few other additional parts introduced by defendants from time to time, all embodying ancient and well-known mechanical principles—"set screws," for instance—complainant uses in subsequent outfits. Upon this, the defendants found their separate counterclaim for unfair competition.

The building up of models requires not only that certain parts shall be of constant shape and size, but that the holes in the parts shall be equidistant from each other, the distance in all the parts between the holes being the same. This establishes a standard. That standard of distance Meccano established as ½ inch. The adoption of the same standard by the defendants was not accidental. If a different standard had been adopted, then American Model Builder parts and Meccano parts could not be interchangeable, since in the Model Builder the parts are substantially the same as the corresponding Meccano outfit of parts. A boy starting with a certain Meccano outfit can gratify his desire for additional parts for the construction of further models by purchasing the American Model Builder parts, resulting in obvious injury to Meccano's business. However strongly defendant asserts ignorance, accident, or mistake, little weight can be given to what he says in the face of what is disclosed by the physical appearance of the outfits, the Manuals, method of arrangement of contents of boxes, and the appearance of the, what might be called, "show case exhibits of separate parts." "Complete Manual of Instruction," issued by defendants, which accompanies each outfit, is called, in Meccano, "Manual of Instructions." Defendants' Manuals may be the result of labor and thought, but the labor and thought is not of an original character, resulting in something new taken from a mass of common information; and it is clear enough that the labor and thought expended has been for the purpose of making a Manual, appro-

priate to the outfit it accompanies, counterfeit the Meccano Manual accompanying the corresponding Meccano outfit; and all for the purpose of deception. Even if there were no evidence tending to show actual palming off of the defendants' for the complainant's goods, there is a silent representation made by the outfits, the arrangement of parts and number of parts, the Manuals and some of defendants' advertisement, or the advertisement of those selling their goods, that "American Model Builder" is the same as Meccano. There are in evidence many instances of deception, confusion, and mistake growing out of the similarity of these goods, even in their extraordinary detail. In addition to the evidence, the physical exhibits themselves disclose, not only the intention of defendants that his outfit is the same as the corresponding Meccano outfit, and that it is interchangeable with Meccano parts, and other evidence in the case establishing both of these charges against the defendants, but there are also in evidence two of defendants' letters which convict them of both charges. The case is so clear that it would serve no useful purpose to set forth the many proved instances of the injurious effect upon complainant's trade caused by defendants' devices and the interchangeability of defendants' parts with the complainant's parts.

One of the earmarks of unfair competition—the sale of the imitating device at a lower price—is abundantly proved in this case. Of course, when dealers can get substantially the same article at a lower price, they will deal in that in which there is "more money." Notable illustrations of this is found in the instances of the Wanamaker stores and the Curtis Publishing Company. In these, Meccano has been largely supplanted by the American Model Builder, for the reasons that they are substantially the same, and it is more profitable for the dealer to buy the imitating article. It is shown also that, for the most part, the prices to the retail trade are less for American Model Builder than for Meccano.

The subject of unfair competition is, for the moment, under consideration. Infringement of copyright and infringement of patent will be dealt with later. It seems to me that unfair competition exists both under the aspect of palming off, which is shown not only by instances in the testimony, but also in the more subtle way, as said by Judge Lacombe, "by simulating the collocation of details of appearance by which the consuming public has come to recognize the product of his competitor." Enterprise Mfg. Co. v. Landers, 131 Fed. 240, 241, 65 C. C. A. 587, 588 (C. C. A. 2), affirming the Circuit Court in 124 Fed. 923. As I read the facts in that case in the District Court, there are two noticeable differences between it and this case when dealing with the subject of palming off one's goods for another. They are that the facts in this case show, if possible, an even more pronounced instance of appropriating all by which the complainant's product had become known to the public, and that the defendant in that case was honest enough to admit all that he had done, but took the position that he was entitled, under the law, to appropriate what belonged to the complainant. He attempted to justify himself, as the complainant does in this case, by the decision of the Circuit Court of

Appeals in this circuit in Globe-Wernicke Co. v. Fred Macey Co., 119 Fed. 696, 56 C. C. A. 304. Judge Platt had no difficulty in distinguishing the facts in that case from the facts before him, and he sets forth some of the reasons. In addition it may be said that, in the Globe-Wernicke Case the units were well known. They belonged to a class of commodities for which there had long been a market. Anybody could build one in the way they were built. Nothing in the way of business system was involved in placing one unit upon another, or several units end to end, in making up a bookcase. In this case, there was not, until Meccano came upon the market, anything like it known. There was no class which would comprise it, or to which it could be assimilated. Further, the various parts in each unit were futile in themselves, and so was the unit made up of the parts. The bookcase unit, as constructed, was the final construction, except, if one wanted to, he could add one to another; but in Meccano the construction of the thing into which the parts in the unit went was in the power of the purchaser alone. He could make such constructions as pleased him, either by suggestions from the Manual, or such as came from the fertility of his own mind, all within the limits of the parts the particular unit comprised. The Globe-Wernicke Case is not helpful to the defendants.

In addition to Enterprise Mfg. Co. v. Landers, 131 Fed. 240, 65 C. C. A. 587, the principle will be found in Yale, etc., Co. v. Alder, 154 Fed. 37, 83 C. C. A. 149 (C. C. A. 2), and Rushmore v. Manhattan, etc., Works, 163 Fed. 939, 90 C. C. A. 299, 19 L. R. A. (N. S.) 269 (C. C. A. 2).

[3] Unfair competition exists also in that the complainant has established a business system which is peculiarly its own. This was done at the expense of time, thought, labor, and much money. If it be assumed that this court is in error with respect to the finding of palming off of defendants' goods for the complainant's, establishing thereby unfair competition, yet the defendants use complainant's business and the system it has established. In these it has acquired a property right of which its competitor cannot deprive it by introducing his goods into, and as a part of, complainant's business and business system. In this respect, the case strongly resembles Prest-O-Lite Co. v. Davis (D. C.) 209 Fed. 917, affirmed by the Circuit Court of Appeals of this circuit, 215 Fed. 349, 131 C. C. A. 491.

If it be assumed that defendant could establish a business system of his own and enter into competition with the complainant's similar system, it seems to me quite clear that the defendant's system could not be so used as to appropriate the business and good will established by the complainant. It cannot be that the defendant can build up his own business by taking away complainant's business through the very method established by complainant for carrying it on. The American Model Builder is not only a fraud on the public, but also a fraud on the complainant.

I find the charge of unfair competition amply established by the facts and under the law.

[4] Defendants are charged with infringement of copyrights No.

291,375 of June 22, 1911, "Meccano Royal Manual," as shown in Plaintiff's Exhibits 42 and 42–A; and No. 294,670 of August 14, 1911, on "Meccano * * * Manual of Instruction for Whole Series of Models" (Plaintiff's Exhibits 38 and 38–A).

The defendants' infringement is charged to be in its Manual of 1912 (Plaintiff's Exhibits 9 and 10 and 112). The publication and distribution of defendants' Manual is not denied, and is also proved. Whether or not complainant's Manual may be properly the subject of copyright may be determined by the test laid down by Judge Jenkins in J. L. Mott Ironworks v. Clow, 82 Fed. 316, 318, 27 C. C. A. 250 (C. C. A. 7), in which he says, referring to certain decisions of the Supreme Court:

"The result of these decisions would seem to place this construction upon the constitutional provision under consideration: That only such writings and discoveries are included as are the result of intellectual labor; that the term 'writings' may be liberally construed to include designs for engraving and prints that are original, and are founded in the creative powers of the mind, the fruits of intellectual labor: * * * that, to be entitled to a copyright, the article must have, by and of itself, some value as a composition, at least to the extent of serving some purpose other than as a mere advertisement or designation of the subject to which it is attached."

When this, together with other statements in the opinion, is applied to complainant's Manual, it cannot be successfully denied that complainant's Manuals were properly copyrighted. Aside from the attractiveness of the designs themselves, it is certain that much thought and labor must have been given to their construction. They are more than an advertisement of complainant's wares. They instruct the purchaser how to use the strips of metal and wheels and nuts and angles and plates, without which even a particularly bright boy would not be able himself to think out the many models set forth. It can scarcely be doubted, too, that in constructing models based on the illustrations, many mechanical devices, of which he would otherwise have no knowledge, are brought to his mind, and many principles of mechanics imparted to him.

The Manual is in reality a key by which the really wonderful treasures contained in the various parts of complainant's outfits may be unlocked. The outfits being the same, the defendant's Manual is also a key to complainant's treasure box. Reed v. Holliday (C. C.) 19 Fed. 325, 326, is applicable to the situation.

[5] That the defendant also regards the complainant's Manual as a proper subject of copyright, is shown by the fact that he has copyrighted his own. Defendant would have the court consider the defendant's Manuals alone as if they were apart from the alleged acts of unfair competition alleged and proved. It is true, it is a different subject, and must be dealt with as such; nevertheless, the acts of unfair competition throw light upon the way defendant's Manuals were made up. Intention is held to be immaterial if infringement otherwise appears. Reed v. Holliday (C. C.) 19 Fed. 325, 327. But I take it that when intention also appears, it is a valuable fact when construing language, figures, and illustrations found in defendant's Manuals.

[6] The thought and labor bestowed by defendant was not, as said

before, in making a new work on the same subject, but was expended largely in paraphrasing the language of some of complainant's statements and descriptions in its Manuals so as to describe the same thing in somewhat different language. Paraphrasing constitutes infringement of a copyright as well as actual copying copyrighted matter. West Publishing Co. v. Thompson Co., 176 Fed. 833, 838, 100 C. C. A. 303.

[7] It is true that a part of the copyrighted Manual is found in Meccano's Manual of 1910, which was not copyrighted, and a prior Manual of 1910, copyrighted (Complainant's Exhibits 40 and 41). But material and substantial matter found in the copyrighted Manuals charged to be infringed will be found in the Manuals complained of, either paraphrased or in the same words. The appropriation of a substantial portion of another's copyrighted work constitutes infringement. Springer Lith. Co. v. Falk, 59 Fed. 707, 712, 8 C. C. A. 224 (C. C. A. 2). It is also true the defendant has not appropriated the entire copyrighted work; but he has materially diminished the value of complainant's work, and appropriated its labors to an injurious extent. This constitutes infringement. Greene v. Bishop, Fed. Cas. No. 5,-763. See, also, Folsom v. Marsh, Fed. Cas. No. 4,901. The true test of piracy, or not, is laid down by Mr. Justice Story in Emerson v. Davies, Fed. Cas. 625, No. 4,436:

"It has been truly said, that the subject of both of these works is of such a nature that there must be close resemblances between them. But the real question on this point, is, not whether such resemblances exist, but whether these resemblances are purely accidental and undesigned, and unborrowed, because arising from common sources accessible to both the authors, and the use of materials open equally to both; whether, in fact, the defendant Davies used the plaintiff's work as his model, and imitated and copied that, and did not draw from such common sources or common materials."

When defendants' Manuals are subjected to the tests laid down in these cases, there is no room for doubt that the Manuals complained of are piracies of complainant's copyrighted Manuals which the defendants are charged in this case with having infringed.

[8] The defendants claim that the copyrights sued on are void and without merit. The objection that certain printed statements in the affidavit of Hills were untrue, and that Hills did not actually see the printing of the copyrighted Manuals in the United States, seems to me frivolous. The first resulted from the failure to strike out from a printed form certain alternative printed statements of facts applicable to the particular capacity in which the affiant appears. Hills neglected to strike out the inapplicable statements, but the affidavit shows, in the application for registration of the large Meccano, 1911, Manual, that he was the duly authorized agent of the claimant of the copyright; and it is quite clear there was no fraud or injury, or intended fraud or injury, worked on the government, or upon any one, by the failure to strike out those printed statements not applicable to the capacity in which he made the affidavit.

[9] As to the second claim, it is true Hills did not see the type set up or the copyrighted Manuals bound. But what he did was in the ordinary course of business. He employed the printer to do the

printing, and furnished him the copy from which to do it. There might have been stronger evidence of these facts; but, so far as appears, the work was done by printers in Albany whose names appeared in evidence. Defendants could have called them. What appears is at least prima facie evidence of the fact that the statute was complied with.

There are many indications that the person or persons who made up the defendants' Manuals complained of must have had before him or them complainant's Manual and illustrations and descriptions; the therein set forth models; statements and prices of separate parts; and the arrangement of these, when the Manuals complained of were made. This conclusion is irresistible from what is found in the respective Manuals, especially when one considers the manner in which the defendants copied complainant's outfits and ideas, and the purposes for which this was done. As an illustration: When figure 48 of the American Model Builder of 1912 (Plaintiff's Exhibit 10) is compared with figure 64, Meccano Manual of 1911 (Plaintiff's Exhibit 38), the conclusion cannot be escaped that one was copied from the other. The fact is defendant copied its Manual both from complainant's copyrighted and uncopyrighted Manuals. And there are ample particulars in the Manuals complained of, sufficiently copied from the Manuals charged to be infringed, to hold the defendant guilty of infringement of complainant's copyright.

[10] Such embarrassment as complainant might otherwise have from the date (1910) on the manual claimed to be like Exhibit 42 is relieved by the showing that the models therein disclosed were not prepared for the market until 1911. The date, 1910, was a mistake, afterwards corrected in the Patent Office, the work being in fact published June 20, 1911.

The claim that the copyright of 1911 was abandoned by the copyright of 1912 cannot be sustained. Complainant may well claim that the copyright of 1912 was for a new book that could have been dated 1911, or 1912. West Publishing Co. v. Thompson Co., 176 Fed. 833, 836, 100 C. C. A. 303 (C. C. A. 2).

[11] So far as the issues in this case are concerned, it is immaterial that editions of Meccano copyrighted Manuals were printed in England and accompanied the Meccano outfits sold in the United States. Bentley v. Tibbals, 223 Fed. 247, 138 C. C. A. 489; Bowker, Copyright, Its History and Its Law, pp. 279, 282, 283; sections 15, 31, and 32, Copyright Act of 1909. The defendant was not injured and cannot complain.

[12] Nor does defendant take anything by his claim that the copyrights are anticipated by Meccano uncopyrighted Manual of 1910, and by complainant's copyrighted "The Hornby System of Mechanical Demonstration." (Why, upon the former, plaintiff's Exhibit 40, is pasted a slip covering the word "copyrighted" does not appear; but apparently the defendant makes no point of this.) Besides many other differences, the former contains no models at all showing the important plates and sector exhibited in complainant's copyright charged to be infringed; and the latter (plaintiff's Exhibit 41), while containing

models in which a plate appears, yet the plate has not the perforated flange and the sector does not appear at all. ·

[13-16] Complainant's claim of infringement of the patent may be disposed of briefly and, for the most part, affirmatively.

The claims deal with flanged metal plates, as therein described and disclosed in the drawings, both the rectangular plate and the plate called "sector." They are of sheet metal with flanges, in both cases perforated, the holes being of the standard distance apart, and may be either circular, or oblong, for purposes of adjustment in the construction of models in which some slight freedom of motion is more desirable, if not necessary. If the patent is valid, there can be no doubt of defendant's infringement.

In addition to the prima facie validity, growing out of the fact that the patent was issued, its utility is further attested, not only by the fact of the defendant's use of it and that he claims to be the inventor himself, but an examination of the Manuals shows the many uses to which both the rectangular plate and the sector may be put, so far as disclosed. They are a valuable and distinct addition to the parts with which, in combination, many structures may be built which, without them—particularly so in the case of the sector—could not have been constructed.

Many uses which the rectangular plate may serve could be similarly effected by building up a construction or frame by appropriate metal strips. But it is apparent that a construction by the strips would lack the rigidity of the plate; and its great simplicity, when compared with the built-up structure appropriate for similar uses, is clear. Furthermore, as one piece, it lends itself to structures which otherwise the young model builder might not, and probably would not, appreciate, in the absence of illustration in a Manual, or otherwise. It tends to encourage construction, as the ingenuity of the boy may discover further uses which would be beyond his capacity if he had before him only the strips. The rectangular plate is not, therefore, one piece built up of the several theretofore known parts, and not patentable, as in Howard v. Stove Works, 150 U. S. 164, 14 Sup. Ct. 68, 37 L. Ed. 1039, and Standard, etc., Co. v. Caster, etc., Co., 113 Fed. 162, 51 C. C. A. 109 (C. C. A. 6). It embodies rather the principle of Dececo Co. v. Gilchrist Co., 125 Fed. 293, 60 C. C. A. 207 (C. C. A. 1). The plates, both rectangular and sector, accomplish a new result, as compared with the strips, and its patentability in these respects is fairly clear. Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177; Krementz v. Cottle Co., 148 U. S. 556, 13 Sup. Ct. 719, 37 L. Ed. 558; Watson v. Stevens, 51 Fed. 757, 2 C. C. A. 500 (C. C. A. 1); Canda v. Michigan Co., 124 Fed. 486, 61 C. C. A. 194 (C. C. A. 6).

If the patentability of the rectangular and sector plates is regarded as doubtful, the fact that they have gone into extensive use should be considered. Standard, etc., Co. v. Caster Socket Co., 113 Fed. 162, 166, 51 C. C. A. 109 (C. C. A. 6), and cases cited therein.

I think, however, that, so far as the language of the claims is applicable to the rectangular plate, the patent in that respect has been anticipated by the disclosures in complainant's own copyrighted book,

"The Hornby System of Mechanical Demonstration" (Plaintiff's Exhibit 41). The plate there appears as an important part, as no doubt it is, and is just like the rectangular plate of the patent, with the exception of the perforations in the flanges. I would not think that so slight a change would remove the rectangular plate from the charge of anticipation.

[17] I find, too, that the block with perforations regularly and uniformly arranged to correspond to the several parts in Quackenbush's patent of September 25, 1877, fairly anticipates complainant's rectangular perforated plates. This conclusion, if correct, requires the holding that the complainant takes nothing from its claim of the patent, so far as they are applicable to rectangular plates.

The claims, so far as they relate to the sector, are not open to this objection, nor do I find it anticipated in the prior art. Figure 4 in Annin's patent of January 21, 1884, forming the bottom of the wheelbarrow disclosed, is a part, it is true, of a built-up toy; but the scope of the Annin patent is so narrow and its purposes so limited that I am unable to say that figure 4 would suggest the sector of complainant's patent. In any event, the sector with its variety of designed and possible uses is so great an improvement of Annin's device as to rise to the dignity of invention. This improvement, its utility and its different forms adapting it to uses of which Annin's device is not capable, together with its prima facie quality, warrant the finding of patentable invention.

[18] If this conclusion with respect to the rectangular plates is wrong, I find from the evidence that, even if the testimony of Wagner, his wife and brother-in-law is true, since Hornby's invention was as early as February 4, 1911, and actual Meccano models were in the United States in June, 1911, and Meccano outfits made up in form for the trade were in the hands of the Meccano United States agency on July 29, 1911, it does not avail Wagner, because he did not exercise reasonable diligence in the actual reduction of his conception to practice. Automatic, etc., Co. v. Pneumatic, etc., Co., 166 Fed. 288, 294, et seq., 92 C. C. A. 206. Nor did the application of defendant Wagner of March 27, 1912, for a patent amount to a reduction to practice, because his application did not claim a patent on the plates, although in his specifications he says:

"The body 1 of the car is built up in the usual manner from the plates and strips of metal bolted together."

And figure 1 in the drawing shows a perforated plate. It does not, however, show the flanged plate, perforated or otherwise. Of course, in any event he must be confined to his claims, and it is reasonably clear that the plate referred to in the specifications and shown in the drawings was not the flanged plate of complainant's patent or the flanged plate of complainant's copyright of 1910. If the story of defendant's conception of the flanged rectangular plate is true, it is strange, since he used a plate at all in the drawings in his application of March, 1912, he did not disclose a flanged plate.

Hornby's claim 8 refers exclusively to the sector. Claims 1 to 7, inclusive, cover both the sector and the flanged plate. Neither de-

fendant's application nor his drawings included the sector. Whatever may be disclosed by the contents of the file wrapper of the Hornby patent in suit, there is nothing in the evidence in the case to sustain the defendant's contention of the disclosures in the file wrapper. No attention is here given to the patents cited by the defendant subsequent to the date of complainant's patent for the reason that they are not regarded as of consequence.

I find claims 1 to 7, inclusive, so far as they embrace the sector, to be valid. Claim 8, covering only the sector, is valid. Claims 9 and 10, covering new and useful combinations, are held to be valid. Defendants infringe all of these.

In view of these conclusions, defendants' counterclaim has no merit.

[19] Defendants assert that complainant comes not into court with clean hands, because for some years it marked its toys: "Patented in the United States January 16, 1906," when that patent was only for a special fastening clip. It did so mark them, but it does not appear that the purpose was to deceive the public. This is an essential element in the offense. Walker v. Hawxhurst, Fed. Cas. No. 17,071; Lawrence v. Holmes (D. C.) 45 Fed. 357, 360, 361; London v. Dunbar Corporation, 179 Fed. 506, 103 C. C. A. 130 (C. C. A. 1). When Hornby was advised—

"that it was doubtful if his early United States patent longer covered the Meccano outfits as then marketed, he immediately gave instructions to the assembling department at Liverpool where all the marking was done, to discontinue it."

[20] But in any event, the wrong was not in connection with the controversy with the defendant, and defendant takes nothing by it. Shaver v. Heller & Merz Co., 108 Fed. 821, 834, 48 C. C. A. 48, 65 L. R. A. 878 (C. C. A. 8); Camors-McConnell Co. v. McConnell (C. C.) 140 Fed. 412, 417; Bentley v. Tibbals, 223 Fed. 247, 252, 138 C. C. A. 489 (C. C. A. 2).

Defendants' counterclaim will be dismissed. An order to that end may be taken; also sustaining the copyright and charges of unfair competition, and the patent, so far as it covers the sector and the combination in claims 9 and 10.

The court requests counsel, when the decree is presented for entry, to again call the court's attention to the matter of the taxation of the costs under rule 58 incurred in obtaining the testimony of Brennan and Read.